**EXHIBIT 2**

**EXHIBIT 2**

ORIGINAL 

FILED

NOV 2 4 2009

*CLERK OF COURT*

FILED

NOV 2 4 2009

*CLERK OF COURT*

A – 09 – 602441 – C
546155



1  MOT
   Griffith H. Hayes, Esq.
2  Nevada Bar No. 7374
   Martin A. Muckleroy, Esq.
3  Nevada Bar No. 9634
4  **COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
   A Professional Corporation
5  3930 Howard Hughes Parkway, Suite 200
   Las Vegas, Nevada  89169
6  Telephone: (702) 949-3100
   Facsimile: (702) 949-3104
7
8  *Counsel for Plaintiffs*
9  [Additional Counsel Listed on Signature Page]

10      **EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
11              **IN AND FOR THE COUNTY OF CLARK**

12  JOHAN L. STOLTZ, Individually and on behalf ) Case No.: A602441
    of all others similarly situated,           )
13                                               ) Dept No.: XXV
                                                 )
14              Plaintiff,                       )
                                                 ) **PLAINTIFFS' APPLICATION**
15      v.                                       ) **FOR A TEMPORARY**
                                                 ) **RESTRAINING ORDER AND**
16  SINOENERGY CORPORATION, TIANZHOU ) **ORDER TO SHOW CAUSE**
    DENG, XIANG DONG YANG, BO HUANG,    ) **WHY A PRELIMINARY**
17  ROBERT I. ADLER, RENJIE LU, GREG     ) **INJUNCTION SHOULD NOT**
    MARCINKOWSKI, BAOHEN SHI, and        ) **ISSUE**
18  SKYWIDE CAPTIAL MANAGEMENT           )
    LIMITED,                             )
19                                       )
                                         )
20              Defendants              )

21
22
23
24          Plaintiffs, by and through their undersigned counsel of the firm of Cooksey, Tooler, Gage,
25  Duffy & Woog, hereby move this Court, pursuant to NRS 33.010 and Nev. R. Civ. P. 65(a)(2), for
26  an order temporarily restraining defendants from holding a shareholder vote on the proposed sale of
27  Sinoenergy Corp., ("Sinoenergy" or the "Company") to Skywide Capital Management Management
28  Limited ("Skywide") (the "Proposed Transaction"), or otherwise taking any steps to consummate the

405.0003  1036836.1                          1

1  Proposed Transaction of Sinoenergy and Skywide. Plaintiffs further seek an order to show cause

2  why a preliminary injunction should not issue, and set an evidentiary hearing for a preliminary

3  injunction.  This Application is based upon the Affidavit of Griffith Hayes and exhibits attached

4  thereto and the attached Memorandum of Points and Authorities.

5

6  Respectfully submitted,
   **COOKSEY, TOOLEN, GAGE,**

7  **DUFFY & WOOG**

8

9  Griffith H. Hayes, Esq.
   Nevada Bar No. 7374

10 Martin A. Muckleroy, Esq.
   Nevada Bar No. 9632

11 3930 Howard Hughes Parkway, Suite 200
   Las Vegas, Nevada 89169

12 Telephone:  (702) 949-3100

13 Facsimile:  (702) 949-3104

14 *Attorneys for Plaintiffs*

15

16 OF COUNSEL:

17 **RIGRODSKY & LONG, P.A.**
   Seth D. Rigrodsky

18 Brian D. Long
   Timothy J. MacFall

19 919 North Market Street, Suite 980

20 Wilmington, DE  19801
   Tel.:  (302) 295-5310

21 Fax:  (302) 654-7530
   *Attorneys for Plaintiff Johan L. Stoltz*

22

23

24

25

26

27

28

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

# NOTICE OF MOTION

TO: ALL INTERESTED PARTIES; and

TO: ALL COUNSEL OF RECORD

NOTICE IS HEREBY GIVEN that the undersigned will bring the above and foregoing PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; AFFIDAVIT OF GRIFFITH HAYES IN SUPPORT OF APPLICATION on for hearing before this Court in Department 15 on the ___7___ day of _JAN_, _2009_, at the hour of _9AM_ _m. of said day, or as soon thereafter as counsel can be heard, in Dept 15, of the Regional Justice Center, 200 Lewis Avenue, Las Vegas, Nevada.

DATED this 23 day of November, 2009.

COOKSEY, TOOLEN, GAGE,
DUFFY & WOOG

Griffith H. Hayes, Esq.
Nevada Bar No. 7374
Martin A. Muckleroy, Esq.
Nevada Bar No. 9632
3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone: (702) 949-3100
Facsimile: (702) 949-3104

3

405.0003  1036836.1

## I.    Introduction

The Nevada Supreme Court has made clear that "[c]laims challenging the validity of a merger should be asserted before the completion of the merger. *This is accomplished by bringing an action to enjoin the merger.*" *Cohen v. Mirage Resorts, Inc.*, 119 Nev. 1, 14, 62 P.3d 720, 729 (2003). Thus, by this Motion, as directed by *Cohen*, Plaintiffs are seeking an order temporarily restraining and enjoining Defendants from proceeding with the planned sale ("Proposed Transaction") of Sinoenergy Corp. ("Sinoenergy" or the "Company") to Skywide Capital Management Ltd ("Skywide"), including a shareholder vote on the Proposed Merger ("Vote"). Skywide is co-owned by the Chairman Tianzhou Deng ("Deng") and Director/C.E.O. Bo Huang ("Huang") of Sinoenergy and is the Company's largest shareholder with approximately 40% of all outstanding shares.

In discussing cognizable challenges to a merger's validity, the Nevada Supreme Court in *Cohen* explained:

> Challenges to the validity of a merger based on fraud usually encompass either or both of the following: (1) lack of fair dealing or (2) lack of fair price. Both involve corporate directors' general duties to make independent, fully informed decisions when recommending a merger and *to fully disclose material information to the shareholders before a vote is taken on a proposed merger....* Lack of fair dealing involves allegations that the board of directors did not make an independent, informed decision to recommend approval of the merger ... These cases also frequently involve the timing of the merger, *merger negotiations, how the merger was structured,* and the approval process

*Id.* at 11-12.

Before the court are circumstances similar to the one that *Cohen* sought to proscribe. Directors Deng and Huang have unrivaled knowledge and control over the affairs of the Sinoenergy Board of Directors (the "Sinoenergy Board" or the "Board") and the Company itself, and through such position of power they are able to exploit their advantage through the acquisition of Sinoenergy at the public shareholders' expense. The Proposed Transaction also contains preclusive deal protection measures such as a no talk/no shop provision, matching rights provision and a termination fee that all but assure Skywide of acquiring Sinoenergy.

On top of the dubious nature of the transaction and the interrelatedness of the transacting parties, the Company's disclosures with the U.S. Securities and Exchange Commission ("SEC") are

1   remarkably scant.  The Company's Preliminary Proxy Statement filed with the SEC on November

2   13, 2009 ("Preliminary Proxy") fails to provide numerous material disclosures that are indispensible

3   in providing shareholders with the necessary information to make an informed decision regarding

4   their shares.  Further the Preliminary Proxy fails to disclose relevant information such as whether the

5   Board considered other potential acquirors or strategic alternatives and the benefit to Company

6   shareholders of this "going private" transaction.

7       Now, absent judicial intervention as envisioned by the Nevada Supreme Court in *Cohen*,

8   Sinoenergy's shareholders will be forever deprived of their holdings in the Company via an unfair

9   process, including the failure to disclose all material information necessary to adequately inform

10  shareholders about the Proposed Transaction.  Accordingly, because Sinoenergy's public

11  shareholders will otherwise be irreparably injured, Plaintiffs seek an order from the Court pursuant

12  to Nev. R. Civ. P. 65(a)(2) temporarily restraining Defendants from taking any steps to consummate

13  the unfair Proposed Transaction, including the Vote.  Plaintiffs further seek an order to show cause

14  why a preliminary injunction should not issue, with an order for expedited discovery to take place in

15  advance of the hearing on a preliminary injunction.  Only through such injunctive relief will

16  Sinoenergy's public shareholders be able to cause defendants to remedy their breaches of fiduciary

17  duty and provide a fair sales process for the Company and a fully-informed vote on any such sale.

18  **II.    Background**

19      Sinoenergy, a corporation organized and existing under Nevada law, maintains its principal

20  offices in Bejing, China.  ¶5[1,2].  Sinoenergy, together with its subsidiaries, develops and operates

21  retail compressed natural gas ("CNG") stations as well as manufactures CNG transport vehicles.

22  Despite a recent threat of de-listing by Nasdaq for its failure to hold an annual meeting of

23  shareholders at which proxies were solicited, the Company trades on the Nasdaq.  *Id.*

24      On October 12, 2009, Sinoenergy issued a press release announcing that it had entered into

25  an agreement with Skywide, a private limited-liability company, whereby Skywide would acquire

26

27  [1]     All "¶" and "¶¶" references are to Plaintiffs Consolidated Class Action Complaint filed on November
        __, 2009 (Muckleroy Aff., Ex. A)

28  [2]     Affidavit of Martin A. Muckleroy in Support of Plaintiffs' Application for an Temporary
        Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue
        ("Muckleroy Aff."), filed concurrently herewith.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

5

405.0003  1036836.1

the outstanding shares of Sinoenergy's common stock for $1.90 per share in cash. ¶31. Skywide, co-owned by Sinoenergy's C.E.O./Director Huang and Chairman Deng, owns approximately 40% of the Company's stock. Six months prior to the announcement of the merger agreement, Skywide sent an unsolicited letter to the Sinoenergy Board expressing its interest in acquiring the Company in a "going private" transaction. Preliminary Proxy, at 13 (Muckleroy Aff. Ex. 1). The Company then engaged a financial advisor, Brean Murray, and legal counsel to single-mindedly pursue this "going private" transaction with Skywide. *Id.* The Preliminary Proxy does not indicate that Brean Murray attempted to solicit other interested parties nor considered strategic alternatives. *Id.* at 13-18. As part of a choreographed set of moves designed to give the impression of a fair process, the Sinoenergy Board engaged in perfunctory negotiations with Skywide over the course of six months and agreed to a merger that substantially favors Skywide, the Company's largest shareholder, over the public shareholders.

Sinoenergy is a company that is growing. Its third quarter report for 2009 (3Q09) announced an increase of 14% in net sales, based in large part on the expansion of Sinoenergy's CNG station operations from one station in 2008 to 21 stations in 2009. ¶29. In the last year, the Company's share price has traded well in excess of the $1.90 consideration currently being offered in the merger. ¶30. This inadequate consideration can only be explained by the fact that the Company is being acquired by an entity owned by its C.E.O. and Chairman, whose own best interests include acquiring the Company as inexpensively as possible. This merger will deny public shareholders their right to share proportionately and equitably in the true value of the Company's business, as well as its future growth in profits and earnings, yet Skywide and Sinoenergy's C.E.O. and Chairman will capture for themselves the Company's future potential without paying an adequate or fair price.

Further, the terms of the merger agreement, negotiated with Sinoenergy's C.E.O. and Chairman on both sides of the deal, substantially favor Skywide and are calculated to unreasonably dissuade potential suitors from making competing offers. The Sinoenergy Board has agreed to a "No Solicitation" provision which prohibits them from communicating with potential buyers and in some circumstances, considering competing proposals. ¶38. Not to mention that Skywide also has

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

6

405.0003  1036836.1

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

1    the ability to match any superior offer that the Company might receive.  ¶39.  The Preliminary Proxy

2    has no explanation of these deal protection devices.  Thus, shareholders are left to wonder whether

3    the Board gave the imposition of deal protection devices any consideration whatsoever, as their

4    fiduciary duties require.  Notably, the Board bears the burden under well-settled law to defend its

5    reasons for agreeing to deal protection devices, and if the Board is expected to answer these

6    questions in the litigation context, it should certainly provide these answers to shareholders before

7    seeking their support for the merger.

        The Company has also filed a materially misleading Preliminary Proxy that fails to fully and

8    fairly disclose certain material information about the Company, its prospects, and the inadequate and

9    unfair sales price.  Shareholders cannot possibly make an informed vote on the merger without

10   adequate information.  The Preliminary Proxy omits or fails to fully disclose information

11   concerning: (1) the Company's relationship with Brean Murray as it pertains to their rendering an

12   impartial fairness opinion; (2) the consideration of any strategic alternatives; (3) the background of

13   any comparables including in the analysis; (4) the negotiation of key merger terms; and (5) financial

14   forecasts or projections for the Company.

15       The entirety of these merger negotiations have been structured unfairly and manipulated by

16   defendants to ensure that Skywide could acquire the Company on the cheap.  With 40% of the

17   Company's common stock, and with its co-owners serving as C.E.O. and Chairman of Sinoenergy,

18   Skywide has been in control of negotiations of the Proposed Transaction.  As such, there is no

19   adequate and impartial representation of shareholder interests in this deal.

20

21   III.    **Argument**

22       A.    **Legal Standard for Injunction**

23       The purpose of a restraining order under Nev. R. Civ. P. 65 is to preserve the *status quo*

24   pending court determination.  *All Minerals Corp. v. Kunkle*, 105 Nev. 835, 838 (1989).  An

25   injunction to maintain the *status quo* is proper if "'injury to the moving party will be immediate,

26   certain, and great if it is denied, while the loss or inconvenience to the opposing party will be

27   comparatively small and insignificant if it is granted.'"  *Rhodes Mining Co. v. Belleville Placer*

28   *Mining Co.*, 32 Nev. 230, 239 (1910) (quoting *Newton v. Levis*, 79 F. 715, 718 (8th Cir. 1897)).  In

determining whether a temporary restraining order should be granted, two factors are relevant: (1) is there a reasonable probability that the plaintiffs will prevail on the merits; and (2) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant. *Number One Rent-A-Car*, 94 Nev. 779, 780-81 (1978); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986).

Injunctive relief is particularly appropriate in the context of a challenge to a merger. Indeed, the Nevada Supreme Court recently reaffirmed its position that "[c]laims challenging the validity of a merger should be asserted before the completion of the merger. This is accomplished by bringing an action to enjoin the merger." *Cohen v. Mirage Resorts, Inc.*, 119 Nev. 1, 14 (2003).[3] Here, plaintiffs are seeking to protect their rights, and the rights of every Sinoenergy shareholder, to exercise their votes with all relevant information at their disposal to enable them to make a fully informed, knowledgeable decision concerning the Proposed Transaction. The decision to grant a temporary restraining order is within the sound discretion of the trial court. *Number One*, 94 Nev. at 780-81.

It is in this court's discretion whether or not to approve the proposed order enjoining the defendants from proceeding with the Proposed Transaction. As the following demonstrates, the factors at issue weigh in favor of granting the injunction so that the Plaintiffs may make an informed decision regarding the Proposed Transaction. The Plaintiffs will suffer great hardship should the court deny the injunction by being forced to vote on the Proposed Transaction without sufficient disclosure, whereas the Defendants will merely have to disclose pertinent information regarding the Proposed Transaction should the court grant the injunction. In fact, full disclosure by the Defendants prior to the vote will protect the Defendants from post-merger litigation should the Company Shareholders seek damages due to be given unfair consideration for their shares.

## B.    Plaintiff's Will Likely Succeed on the Merits

The principal legal question posed by this action is whether Defendants have breached the fiduciary duties owed to Plaintiffs and the members of the Class by negotiating and approving the

---

[3]    The Court went on to state: "If injunctive relief is denied and the merger is carried out, a dissenting shareholder may still pursue a claim for rescission and/or monetary damages on the grounds of fraud or unlawfulness." *Id.*

8

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

unfair Proposed Transaction, and by failing to provide all material information to shareholders in connection with the vote thereon. The shareholder who challenges a board's conduct in the context of a sale of control of the Company is entitled to have the Board's conduct scrutinized by the Court. *Cohen*, 119 Nev. at 17-18 (noting that the "application of higher scrutiny arises from the duty of candor and disclosure that is imposed upon directors . . . in the merger process"); *see also Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994); *Revlon*, 506 A.2d at 180. The enhanced scrutiny test requires: "(a) a judicial determination regarding the adequacy of the decision making process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing." *Paramount*, 637 A.2d at 45. Significantly, under this test "[t]he directors have the burden of proving that they were adequately informed and acted reasonably." *Id.*

It is well-established that directors and officers of a corporation stand in a fiduciary relationship with the corporation's shareholders. *See, e.g., W. Indus., Inc. v. Gen. Ins. Co.*, 91 Nev. 222, 228 (1975); *see also Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998). With respect to these fiduciary duties, the Nevada Supreme Court recently held in *Cohen* that "[c]hallenges to the validity of a merger based on fraud usually encompass either or both of the following: (1) lack of fair dealing or (2) lack of fair price." 119 Nev. at 11-12. "Both involve corporate directors' general duties to make independent, fully informed decisions when recommending a merger and to fully disclose material information to the shareholders before a vote is taken on a proposed merger." *Id.* Nevada courts have held when, as here, a plaintiff has established a viable claim of a breach of a duty, he is entitled to preliminary injunctive relief. *See id.* at 11-14.

### 1. Plaintiffs Can Demonstrate a Lack of Fair Dealing

According to *Cohen*, "[l]ack of fair dealing involves allegations that the board of directors did not make an independent, informed decision to recommend approval of the merger, or that the majority shareholders approved the merger at the expense of the minority shareholders." *Id.* at 12. Claims alleging lack of fair dealing arise when "the directors, officers, or majority shareholders had conflicts of interest or were improperly compensated or influenced in return for their approval of the

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

405.0003  1036836.1

merger and that the shareholders lacked material information regarding the merger when they voted for it." *Id.* Key factors include "the timing of the merger, merger negotiations, how the merger was structured, and the approval process." *Id.* Here, several factors show that the Proposed Transaction was not subjected to propoer scrutiny in ensuring that the shareholders are getting fair consideration.

a.   **Directors are on both sides of the transaction, creating a direct conflict of interest with the Sinoenergy Shareholders**

Deng and Huang, in their capacities as both directors of Sinoenergy and owners of the acquiror Skywide—which is also the controlling shareholder of the Company with approximately 40% of the stock—have an inherent conflict of interest that directly influences their approval of the merger. The proper test for determining whether a director has a conflict of interest is whether the director "was or would likely be affected" by a separate financial interest. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) (alteration in original) (citation omitted). The court must "carefully scrutinize the board's actions to ascertain whether the board achieved a fair price for the disinterested stockholder minority" when the share price is "determined as a result of a bargaining process in which the controlling shareholder [is] in a position to influence both bargaining parties." *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 689 (Del. Ch. 1996) (citations omitted). In a situation where board members are on both sides of a transaction, they "have the burden of demonstrating that the Merger was entirely fair." *Id.*

Upon information and belief, Deng and Huang are in positions of unmatched authority and control, not only over the Board, but also over the day-to-day operations of Sinoenergy. In an amendment to the Company's Registration Statement filed on December 31, 2008, the Company acknowledged that its "business is largely dependent upon the continued efforts of our chief executive officer, Bo Huang, and our chairman, Tianzhou Deng," and that a loss of either "could have a material adverse effect upon our ability to operate profitably." Form S/1-A, at 11 (Muckleroy Aff. Ex. 2) Indeed, they are the only two directors who list their addresses as Sinoenergy headquarters. Therefore, (i) because Deng and Huang are on both sides of the transaction, (ii) because they exert undue influence over the Board and favored Skywide at the Company's expense,

10

405.0003  1036836.1

and (iii) because of their unmatched knowledge and importance to Sinoenergy, there exists a direct conflict of interest with the Proposed Transaction.

### b. The Sinoenergy Board failed to shop the Company

The Individual Defendants did not disclose why they agreed to the Proposed Transaction without a thorough examination of the market, or by soliciting for other bidders. In circumstances such as this when the controlling shareholder/directors are buying a company, the Defendants must present compelling evidence that the price offered was fair. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Their failure to conduct a market check prior to entering into the Proposed Transaction, the insider dealings, and the deal protection devices—discussed below—ensure that the Shareholders will not get a fair price.

### c. The Sinoenergy Board impermissibly locked up the Proposed Transaction with onerous deal protection devices

Lock-up provisions are not permissible when the Board has conflicts of interest or when it has breached its fiduciary duty. *See Revlon*, 506 A.2d at 176. Under similar circumstances, courts have held that corporate acquisitions should be enjoined until onerous deal protection devices such as those detailed below are removed, allowing competing bidders to make renewed or revised offers. *Edelman v. Fruehauf Corp.*, 798 F.2d 882, 886-87 (6th Cir. 1986) (holding that use of lock up devices, including a termination fee, should be enjoined as a breach of the duty of loyalty when target board agreed to implement such devices without providing shareholders with a fair auction for corporate control); *Revlon*, 506 A.2d at 184 (court found that a target board's use of lock up devices to abruptly end an auction for corporate control was a breach of the board's fiduciary duties); *Paramount*, 637 A.2d at 49 (holding that use of lock-up devices, including a termination fee, to ensure sale of the company to a favored bidder was a breach of fiduciary duty when instituted and maintained by a target board who failed to negotiate in good faith with a potential acquiror).

Here the Board impermissibly locked up the Proposed Transaction with deal protection devices that make it impossible for any potential competing bidders to make competing bids. The Board agreed to these devices prior to conducting any investigation into potential strategic alternatives for the Company to pursue. These onerous and preclusive deal protection devices that

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

11

operate conjunctively to make the Proposed Transaction a *fait accompli* include, but are not limited to: (i) the no shop/no talk clause; (ii) matching rights provision; and (iii) the $500,000 termination fee. Such devices run counter to the Board's duty to maximize shareholder value. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 936 (Del. 2003); *Revlon*, 506 A.2d at 184;.

### (1) The no shop/no talk and matching rights provisions must be rescinded

Defendants' agreement to the no shop/no talk and one matching rights provision impermissibly serves to preclude other bidders from making competing bids for the Company. The provisions severely limit the Board's ability to communicate with other bidders, and grant Skywide the right to see and match any superior alternative proposal. The provision is a "keep-away" clause akin to a right-of-first refusal that enables incremental bidding by Skywide. *See* Guhan Subramanian, *The Drivers of Market Efficiency in Revlon Transactions*, 28 IOWA J. CORP. L. 691, 710 (2003). *See generally* David I. Walker, *Rethinking Rights of First Refusal*, 5 STAN. J.L. BUS. & FIN. 1 (1999). Indeed, such provisions are the likely culprits when proposed mergers that undervalue a company that would otherwise be an easy target for competing offers stand uncontested. *See 28 Iowa J. Corp. L.* at 710.

The matching rights provision is especially onerous here, because Deng and Huang are Company insiders who face no opportunity costs by making incrementally higher bids. Competing bidders, however, must weigh the benefits of engaging in an incremental bidding war against the costs of losing out on other deals, knowing all the while that they could sink funds into raising their bid just to see it topped. Accordingly, the matching rights provision is an impermissible obstacle to higher competing bids.

### (2) The Termination Fee must be invalidated

For a contract provision such as the termination fee to be enforceable, the provision must be proportionate to the actual damages suffered by the party. *Mason v. Fakhimi*, 109 Nev. 1153, 1156 (Nev. 1993). Here, the termination fee does not and cannot bear any relation to any potential damages Skywide might suffer if the Merger Agreement is terminated. Because Skywide's owners are Company insiders with full access to the confidential information about the Company, they

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

405.0003  1036836.1

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

1  undoubtedly have incurred meager transaction costs in putting together this bid.  Further, as insiders

2  with unfettered access to Sinoenergy's information they cannot complain that they have suffered the

3  opportunity costs that are often touted as a basis to justify termination fees.  Thus the termination fee

4  is nothing more than an unenforceable penalty clause.

5          **d.**       **Defendants breached their duty of candor**

6          **(1)**    **The Board's disclosure duties**

7        The fiduciary duty of candor requires disclosure of all information in defendants' possession

8  germane to the transaction at issue. *See Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del.

9  1992); *Stroud v. Grace*, 606 A.2d 75, 84-85 (Del. 1992); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929,

10  944 (Del. 1985).  Directors "are under a fiduciary duty to disclose fully and fairly all material

11  information within the board's control when it seeks shareholder action." *Arnold v. Society for Say.*

12  *Bancorp.*, 650 A.2d 1270, 1277 (Del. 1994).  The well-established test for whether a fact is material

13  is as follows:

14        An omitted fact is material if there is a substantial likelihood that a reasonable
      shareholder would consider it important in deciding how to vote . . . . It does not

15        require proof of a substantial likelihood that disclosure of the omitted fact would have
      caused a reasonable investor to change his vote. at the standard does contemplate is a

16        showing of a substantial likelihood that, under all the circumstances, the omitted fact
      would have assumed actual significance in the deliberations of the reasonable

17        shareholder. Put another way, there must be a substantial likelihood that the disclosure
      of the omitted fact would have been viewed by the reasonable investor as having

18        significantly altered the "total mix" of information made available.

19  *Id.*

20        Courts should not assess the qualitative importance of a particular disclosure item,

21  because the standard requires "full" disclosure of all material facts. *Id.*  The standard is

22  whether the fact would have been relevant to investors' decisions, not whether it necessarily

23  would have changed investors' decisions regarding the transaction. *See Shell Petroleum*, 606

24  A.2d at 114; *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1289 (Del. 1989).

25        The Board's duty of disclosure is greater in a going private transaction governed by

26  Rule 13E-3, such as the Proposed Transaction.  As one Delaware court explained:

27        A related reason for requiring the strictest possible standard of disclosure is that
      corporate self-tenders, by their very nature, involve built-in conflicts of interest
      between the fiduciaries responsible for conducting the offer and the stockholders to

28        whom the offer is directed. . . . The directors are acting both as the representatives of
      the corporate offeror and as fiduciaries for the shareholder-offerees. *That dual role*

*necessarily gives rise to a potential conflict of the directors, which calls for procedural protections for the stockholders whose interests may not be adequately represented.*

*Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987).

Accordingly, the "importance of a complete disclosure [in a going private transaction]...is enhanced" and "management has a heavy burden to insure that disclosure is complete and non-misleading, especially with respect to shareholders whose interests may differ from their own." *Blanchette v. Providence & Worcester Co.*, 428 F. Supp. 347, 354 (D. Del. 1977); *see also Plaza Sec. Co. v. Fruehauf Corp.*, 643 F. Supp. 1535, 1544 (E.D. Mich. 1986) (holding that "disclosures and nondisclosures [pursuant to Rule 13E-3] must be especially rigorous"). As the First Circuit noted:

> [W]hen the interests of the management conflict with those of the shareholders (and we note that this may happen in a hostile takeover, where the management seeks to preserve its endangered jobs, as well as in an uncontested merger), *the court is entitled to regard the management's disclosures with a certain skepticism, and to resolve doubts in favor of the shareholders.*

*Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1231 (1st Cir. 1984) (emphasis added).

The omission of material information in connection with a merger transaction supports the granting of an injunction. *See Gilmartin v. Adobe Res. Corp.*, No. 12467, 1992 WL 71510, at *13 (Del. Ch. Apr. 6, 1992) ("To allow the merger to go forward [with a false proxy] would deprive the . . . Stockholders [the right to full disclosure], whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right.").

(2)     **The Sinoenergy Board failed to disclose material details of the sales process**

Despite these well-defined duties of disclosure, the Board failed to provide shareholders with material information about the sales process that was unfairly tilted towards Skywide. Specifically, the Board withheld material information, including: (i) the lack of strategic buyers in the process; (ii) the nature of the business relationship with Brean Murray and the manner in which it will collect its fees; (iii) why the Special Committee determined it

14

405.0003 1036836.1

1   was proper to begin negotiations with Skywide without conducting a market check; (iv) why

2   the Company received a presentation from Brean Murray on July 7, 2009 regarding the

3   fairness of the $1.90 price when there is no record of a Special Committee or Board meeting

4   that day or any time during the month of July; (v) why the Company failed to disclose why

5   Brean Murray did not perform a discounted cash flow analysis and other analyses; or (vi) any

6   financial forecast whatsoever in the Preliminary Proxy. This information is material because

7   it bears on the fairness of the sale process. Without this vital information, shareholders are

8   unable to make an informed decision concerning whether, in spite of these significant

9   infirmities in the process, they "would prefer the bird in hand" presented by the Proposed

10  Transaction. *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 210 (Del. Ch.

11  2007).

12      A decision in Delaware makes clear that the Board owes disclosure of these sales

13  process details to shareholders. In *Netsmart*, the court held that the company's board violated

14  its duty of disclosure when it failed to accurately inform shareholders about its efforts, or lack

15  thereof, to involve strategic buyers in the sales process. *Id.* at 195-97. The *Netsmart* court,

16  after examining the Netsmart proxy in detail, concluded that the board's description of the

17  search for strategic buyers "leads one to the [false] impression that a more reasoned and

18  thorough decision-making process had been used" in considering strategic buyers. *Id.* at 209.

19  The *Netsmart* court enjoined the merger until the board disclosed a "fuller, more balanced

20  description of the board's actions with regard to the possibility of finding a strategic buyer."

21  *Id.*

22      Just as in *Netsmart*, the Board here has failed to provide shareholders with the detailed

23  and balanced information necessary to apprise shareholders of the facts of the sales process.

24  Shareholders absolutely must be given the details of negotiation process, especially when the

25  Board has locked up the Proposed Transaction with deal protection devices. Shareholders

26  also must be told the full story about the unfolding sales process: why Brean Murray did not

27  conduct analyses common in transactions such as the Proposed Transaction, and why there is

28  no disclosure as to why the Special Committee or the Board even considered, let alone

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

405.0003  1036836.1

15

1   decided to adopt the Proposed Transaction.  These issues are barely touched on in the

2   Preliminary Proxy, and treated in a misleading fashion.  "When directors describe their

3   decision-making process leading up to a merger, they must do so in a fair and balanced way."

4   *Id.* n.120; *see also Malone*, 722 A.2d at 12; *Arnold*, 650 A.2d at 1280-82.

5       Moreover, two elements of the Board's duties in connection with the Proposed

6   Transaction exacerbate the Board's failure to be candid with shareholders here. Because the

7   Board set up a special committee in a (failed) attempt to insulate themselves from liability,

8   they have a duty to disclose all information that bears on the fundamental question of whether

9   "the Special Committee process functioned effectively" regardless of whether disclosure of

10  such information might otherwise be termed "self-flagellation." *Clements v. Rogers*, 790

11  A.2d 1222, 1243 n.62 (Del. Ch. 2001).  To this end, defendants must disclose facts that paint

12  "a fair and balanced" picture for shareholders of the special committee's process." *Id.* at 1242-

13  43.

14      Accordingly, the Proposed Transaction must be enjoined at least until defendants

15  disclose this information relevant and material to the sales process, and shareholders have

16  sufficient time to digest the information to make an informed decision whether to vote in

17  favor of the Proposed Transaction.  *Netsmart*, 194 A.2d at 207-09; *see also State of Wis. Inv.*

18  *Bd. v. Bartlett*, No. 17727, 2000 WL 193115, at *1 (Del. Ch. Feb. 9, 2000) (enjoining a

19  merger for 15 days to ensure that "shareholders have had a reasonable period of time to

20  receive, consider and act upon the supplementary proxy materials"); *La. Mun. Police Emples.*

21  *Ret. Sys. v. Crawford*, Nos. 2635, 2663, 2007 WL 625006, at *1 (Del. Ch. Feb. 13, 2007)

22  (delaying a shareholder vote for 17 days to allow shareholders to digest supplemental

23  disclosure made on the eve of a scheduled shareholder vote).

24  **2.   Plaintiffs Can Demonstrate Lack of Fairness in Proposed Transaction's**
        **Price**

25

26      The Defendants did not adequately carry out their fiduciary duty by failing to offer a fair

27  price to the Sinoenergy Shareholders.  Like lack of fair dealing, "[l]ack of fair price may involve

28  similar allegations plus claims that the price per share was deliberately undervalued, but it can also

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

16

include negligent conduct." *Cohen*, 119 Nev. at 12; *see also Tad's*, 709 A.2d at 694 (holding that it is "the defendants' burden to demonstrate to the satisfaction of the Court that those transaction prices were values that a reasonable seller, under all of the circumstances, would regard as within a range of fair value") (citation and quotations omitted). Nevada law requires a fiduciary or trustee to obtain the best price when selling property for the benefit of another. *See Runkle v. Gaylord*, 1 Nev. 123 (1865). *See also Powell v. Thorsen*, 322 S.E.2d 261, 263 (Ga. 1984) (requiring fiduciary to sell property at best possible price). In the context of a proposed sale of a company, this common sense notion has been interpreted to require a board of directors to assume the role of an "auctioneer[] charged with getting the best price for the stockholders at the sale of the company." *Revlon*, 506 A.2d at 182; *accord Paramount*, 637 A.2d at 42-46. The Defendants failed in several respects to adequately evaluate the transaction or determine a proper price for the shareholders.

         **a.**      **The existence of Directors on both sides of the transaction directly affects the price offered to the Shareholders**

As discussed in greater detail above, *see supra* Section III.B.1.a., due to Deng and Huang's (i) ownership of the acquirer, Skywide, (ii) controlling stake in the Company through Skywide, and (iii) far superior knowledge of Sinoenergy's business operations compared to the rest of the Board, the Defendants bear the burden of demonstrating that the price being offered is a fair price. *See Paramount*, 637 A.2d at 45; *cf. Cohen*, 117 Nev. at 17-18 (requiring higher scrutiny for interested-party transactions). Rather than seek to maximize the share price offered to the Shareholders, it is actually in Deng and Huang's interest to *offer a lower share price*, thereby maximizing their return on the purchase of Sinoenergy.

         **b.**      **The transaction contains provisions which benefit various noteholders at the expense of the Shareholders**

Not only does the transaction seek to benefit Deng and Huang at the expense of the Company's public shareholders, it also will benefit the holders of senior and senior convertible notes, two of which are entities owned and operated by Defendant Yang (collectively the "Noteholders"). Less than two weeks before the Proposed Transaction was announced, the parties amended the indenture agreements, accelerating $16 million in senior notes that will be payable

17

1  upon completion of the Proposed Transaction. This benefit to the Noteholders is yet another conflict

2  of interest, this time with Defendant Yang, and further demonstrates that this transaction was

3  conducted in a manner that was not at arm's length.

### c. The Board undervalued the Company's prospects

5  Sinoenergy appears poised to experience protracted growth that far exceeds the consideration

6  offered to the Shareholders. The Company's share price has traded over $3 in the past year, their

7  book value is $3.53 per share, and at least one analyst has a median target of $9.90 per share. The

8  Company posted an increase in net sales of $30.6 million in June 2009, representing a 14% increase.

9  Whereas the Company only had one CNG station in operation in June 2008, it now has 21 stations in

10  operation as of June 2009. All of this is indicative of a healthy company, and places the burden of

11  proving otherwise squarely on the shoulders of the Sinoenergy Board.

### d. Temporarily enjoining the Proposed Transaction is necessary to obtain the highest value for shareholders and to provide necessary information to shareholders

14  The function of a preliminary injunction is to prevent prospective damage. *All*

15  *Minerals Corp.*, 105 Nev. at 838; *accord Nutro Prods., Inc. v. Cole Grain Co.*, 3 Cal. App.

16  4th 860, 865 (1992) (affirming trial court's issuance of preliminary injunction). Accordingly,

17  this Court must exercise its discretion "in favor of the party most likely to be injured." *Nutro*

18  *Prods.*, 3 Cal. App. 4th at 867 (quoting *Robbins v. Superior Court*, 38 Cal. 3d 199, 204

19  (1985)). Here, plaintiffs are the party most likely to be harmed.

20  It is well settled that, in cases such as this where the Board has failed "to get the

21  highest value reasonably attainable for the shareholders," irreparable harm has been

22  established. *See Paramount*, 637 A.2d at 44. "Since the opportunity for shareholders to

23  receive a superior control premium would be irrevocably lost if injunctive relief were not

24  granted, *that alone would be sufficient to constitute irreparable harm.*" *QVCNetwork v.*

25  *Paramount Commc'ns*, 635 A.2d 1245, 1273 n.50 (Del. Ch. 1993), *aff'd*, 637 A.2d 828 (Del.

26  1993). Courts have "tended to reject the notion that stockholders do not face a threat of

27  irreparable injury when a board seems to have breached its *Revlon* duties or failed to disclose

28  material facts in advance of a merger vote." *Netsmart*, 924 A.2d at 207. This is because, even

18

405.0003 1036836.1

1 though "there is the chance to formulate a rational remedy down the line . . . that chance

2 involves great cost, time, and, unavoidably, a large degree of imprecision and speculation.

3 After-the-fact inquires into what might have been had directors tested the market adequately

4 or stockholders been given all the material information necessarily involve reasoned

5 guesswork." *Id.*

6          As alluded to above, irreparable harm is further established when uninformed

7 shareholders are asked to vote in favor of a proposed merger. *See ODS Techs., L.P. v.*

8 *Marshall,* 832 A.2d 1254, 1262 (Del. Ch. 2003); *In re Pure Res., Inc., S'holders Litig.,* 808

9 A.2d 421, 452-53 (Del. Ch. 2002). A denial of plaintiffs' application will forever foreclose

10 shareholders' ability to make an informed decision on this fundamental question concerning

11 the very corporate existence of Sinoenergy. Vindication of the recognized right to cast an

12 informed decision "requires a specific remedy such as an injunction, rather than a substitute

13 remedy such as damages." *Gilmartin,* 1992 WL 71510, at *13; *see Eisenberg,* 537 A.2d at

14 1062; *Joseph v. Shell Oil Co.,* 482 A.2d 335, 344 (Del. Ch. 1984). No other right would be

15 effective, as once the Proposed Transaction is consummated the merger cannot easily be

16 undone. In this case, defendant's failure to disclose material information regarding the sales

17 process warrants the issuance of a temporary restraining order to postpone the consummation

18 of the Proposed Transaction. Indeed, as the *Netsmart* court recently stated:

19          [T]his court has typically found a threat of irreparable injury to exist when it
           appears stockholders may make an important voting decision on inadequate
20         disclosures. By issuing an injunction requiring additional disclosure, the court
           gives stockholders the choice to think for themselves on full information,
21         thereby vindicating their rights as stockholders to make important voting and
           remedial decisions based on their own economic self-interest.

22 194 A.2d at 207.

23   **C.    Balance of Hardships**

24          "A preliminary injunction to preserve the status quo is normally available upon a

25 showing that the party seeking it enjoys a reasonable probability of success on the merits and

26 that the defendant's conduct, if allowed to continue, will result in irreparable harm for which

27 compensatory damages is an inadequate remedy." *Number One,* 94 Nev. at 780. This

28

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

19

1  involves a balancing of the conveniences and possible hardships of the parties. *Revlon*, 506

2  A.2d at 179.

3  Here, no hardship to the defendants will occur as a result of the sought-after injunctive

4  relief. In circumstances such as this, where the shareholders have not received sufficient

5  disclosures from the company, "it is appropriate for the court to address material disclosure

6  problems through the issuance of a preliminary injunction that persists until the problems are

7  corrected." *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001) "An

8  injunctive remedy of that nature specifically vindicates the stockholder right at issue—the

9  right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in

10 a manner that later monetary damages cannot and is therefore the preferred remedy, where

11 practicable." *Id.*; *see also In re Anderson, Clayton S'holders Litig.*, 519 A.2d 669, 676 (Del.

12 Ch. 1986) (recognizing, in balancing harm, that "delay in any large transaction may involve

13 risks of employee agitation or market fluctuations," but finding those factors not "especially

14 significant" in view of the "fundamental importance" of the transaction "and its likely long-

15 term consequences").

16 Indeed, postponement of the Proposed Transaction is beneficial to Defendants, as it

17 gives them time to correct their breaches of fiduciary duty and avoid the years of litigation that

18 would likely arise if defendants were to obtain shareholder approval for an inferior deal based upon a

19 sales process that was defective and without providing shareholders all material information

20 necessary to decide whether to vote in favor of the Proposed Transaction despite its inadequacies.

21 *See Netsmart*, 924 A.2d at 207-08 ("By this approach, the court also ensures that greater effect can

22 be given to the resulting vote down the line, reducing future litigation costs and transactional and

23 liability uncertainty."). As the court in *Gilmartin* noted:

24

25 To allow the merger to go forward would deprive the [] Stockholders of [the
   right to full disclosure, whereas a preliminary injunction for a brief period to
26 enable the defendants to make corrective disclosure is the remedy most likely
   to vindicate that right.

27 1992 WL 71510, at *13.

28

20

1  Defendants themselves cannot claim that they will be harmed by a short delay. A short

2  delay, caused by Defendants' own failure to take appropriate action, to allow the sales process

3  to reach its natural conclusion and enable Sinoenergy's shareholders to make an informed

4  decision, can hardly be construed to cause defendants harm.

5  **D.     Only a Nominal Bond Is Required**

6  While a bond may be required as a condition of issuance of a preliminary injunction,

7  the amount of the bond is within the Court's discretion, based on the evidence that an

8  injunction would cause. Nev. R. Civ. P. 65. The enjoined party must present admissible,

9  competent, qualitative and quantitative evidence of harm that an injunction would cause "by

10  any party who is found to have been wrongfully enjoined or restrained." *Id.* Given that the

11  requested injunction actually benefits the parties to be restrained—Defendants—in their

12  capacity as directors of Sinoenergy because it prevents them from continuing to breach their

13  fiduciary duties to Sinoenergy's shareholders, defendants cannot prove any harm here. Thus,

14  only a nominal bond of no more than $500 should be required.

15  **IV.   CONCLUSION**

16  For all of the foregoing reasons, the Court should grant Plaintiffs' application for a

17  temporary restraining order and order to show cause why a preliminary injunction should not

18  issue, and should permit expedited discovery in advance of the hearing on the preliminary

19  injunction.

20  DATED: November 23, 2009                    Respectfully submitted,

21                                              **COOKSEY, TOOLEN, GAGE,**
                                                **DUFFY & WOOG**

22

23                                              Griffith H. Hayes, Esq.
                                                Nevada Bar No. 7374

24                                              Martin A. Muckleroy, Esq.
                                                Nevada Bar No. 9632

25                                              3930 Howard Hughes Parkway, Suite 200
                                                Las Vegas, Nevada 89169

26                                              Telephone: (702) 949-3100
                                                Facsimile:  (702) 949-3104

27

28

*COOKSEY, TOOLEN, GAGE, DUFFY & WOOG*

405.0003  1036836.1

21

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Timothy J. MacFall
919 North Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

*Attorneys for Plaintiff Johan L. Stoltz*

405.0003  1036B36.1